■ In the Matter of BRIANNA R., a Child Alleged to be Neglected. MARIBEL R., Appellant; ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent. [981 NYS2d 95]—

Order, Family Court, Bronx County (Gayle P. Roberts, J.), entered on or about October 15, 2012, which, after a fact-finding hearing, found that respondent mother neglected the subject child by failing to provide for her educational needs and by failing to provide her with adequate guardianship, reversed, on the law and the facts, without costs, the finding of neglect vacated, and the petition dismissed. Appeal from order of disposition, same court and Judge, entered on or about November 9, 2012, which released the subject child to respondent mother with petitioner agency's supervision for up to six months, dismissed, without costs, as academic.

Petitioner Administration for Children's Services (ACS) failed to establish by a preponderance of the evidence that the 15-year-old child was educationally neglected (Family Ct Act §§ 1012 [f]; 1046 [b] [1]). Although the child had an excessive amount of absences from school, such absences "do[ ] not, ipso facto, establish either the parental misconduct or the harm or potential harm to the child necessary to a finding of [educational] neglect under Family Ct Act § 1012 (f) (i) (A)" (*Matter of Giancarlo P.*, 306 AD2d 28, 28 [1st Dept 2003]). Here, the record shows that the mother faced obstacles in getting the child to attend school on a regular basis. The mother took the child to school for a period of time, but she was financially unable to escort the child to school on an ongoing basis.* Moreover, even when the child was present, she had a history of truancy, tardiness, leaving school early and loitering in the hallways.

The record further demonstrates that the child was defiant, violent, and had a history of lying and threatening to harm herself when the mother did not allow her to do what she wanted. The child also suffered from mood disorder, and had continuous hallucinations that made sleep difficult. The child was eventually hospitalized, and was given a number of psychiatric diagnoses. As a result, she was prescribed medication that caused her to be drowsy and disoriented, which further exacerbated her unwillingness and inability to attend school.

Under the circumstances, the mother was unable to control the child and, despite her best efforts, struggled to get the child to attend school regularly, as well as to her therapy and drug treatment appointments (*see Matter of Shanae F.*, 61 AD3d 403 [1st Dept 2009]; *Matter of Alexander D.*, 45 AD3d 264 [1st Dept 2007]; *see also* Education Law § 3212 [requiring every parent to send his or her school-age child to school, while specifically exempting from compliance any parent whose child is beyond his or her ability to control]). Here, as we found in *Matter of Giancarlo P.* and *Matter of Shanae F.*, we find that the mother exercised the minimum degree of care that section 1012 (f) (i) of the Family Court Act requires. Indeed, despite the many obstacles the mother faced, she took steps to ensure that the child attended school. For example, the mother explored the possibility of transferring the child to a school closer to her

---

* As the mother points out, while the Family Court faulted her for not providing information about her income or finances in support of her claim that she could no longer continue escorting the child to school, the court found at the same time that the mother was indigent in this proceeding. Thus, the court must have had some evidence of the mother's financial status. We note that the dissent adopts this argument, opining that the mother presented "self-serving" testimony about not having a MetroCard.

home in the Bronx and spoke with school personnel over the phone many times about the child's attendance. Thus, the record shows that any impairment the child suffered was as a result of her various psychiatric and behavioral issues, rather than the mother's failure to compel her to attend school.

Significantly, neither the dissent nor ACS acknowledges that ACS itself could not control the child when she was in its custody. Indeed, from November 18, 2011 to February 14, 2012, it is undisputed that while the child was in ACS' custody, she absconded and failed to attend school. Similarly, the child's school had difficulty maintaining control of her. As noted above, the child frequently left school early even when she did attend. Thus, the evidence shows that not only was the child beyond the control of the mother, but was also beyond the control of ACS and the school.

The cases upon which the dissent relies are factually distinguishable. Contrary to ACS' and the dissent's characterizations, we based our neglect findings in those cases on more than school absences alone. For example, in *Matter of Kaila A. (Reginald A.—Lovely A.)* (95 AD3d 421, 421 [1st Dept 2012]), this Court held that, in addition to the school absences, the "respondent had neglected the child by committing acts of domestic violence against the child's mother in the child's presence." Similarly, in *Matter of Aliyah B. (Denise J.)* (87 AD3d 943, 943 [1st Dept 2011]), this Court held that, the "mother neglected her children by committing acts of domestic violence against the children's father in the children's presence."

Regarding that part of the court's finding of neglect based upon a 15th birthday party that the mother hosted for the child, at which the police discovered empty beer containers, there was no evidence that the child had consumed alcohol that night. To the contrary, the child denied consuming alcohol because she was taking her medication. Thus, any finding of neglect based upon that incident is speculative. To be sure, although the mother exercised poor judgment when she decided to host the party, the record contains no evidence that the child's physical, mental or emotional condition was impaired or was in imminent danger of becoming impaired as a result of this one isolated incident (*see Matter of Pria J.L. [Sharon L.]*, 102 AD3d 576 [1st Dept 2013]).

In view of the foregoing, the appeal from the order of disposition has been rendered academic (*see Matter of Shaun B.*, 55 AD3d 301, 302 [1st Dept 2008], *lv denied* 11 NY3d 715 [2009]).

Concur—Acosta, Moskowitz and Clark, JJ.

Sweeny, J.P., and Saxe, J., dissent in a memorandum by

Sweeny, J.P., as follows: The evidence adduced before the Family Court clearly established, by a preponderance of the evidence, that Brianna is a neglected child (Family Ct Act § 1012 [f] [i] [A]).

The unrefuted testimony shows that Brianna was absent from school 83 days during the 2009-2010 school year, and absent 63 days and late five days during the first half of the 2010-2011 school year. It is also unrefuted that her excessive absenteeism resulted in her abysmal academic performance. This is more than sufficient to establish a case of educational neglect (*Matter of Ember R.*, 285 AD2d 757, 758 [3d Dept 2001], *lv denied* 97 NY2d 604 [2001]). To refute this, respondent had to show that she exercised a minimum degree of care so as not to impose a risk of impairment to the child or place the child in imminent danger of impairment (*Matter of Dyandria D.*, 303 AD2d 233 [1st Dept 2003]).

The cases cited by the majority in support of its position are inapposite to the facts and circumstances of this case. The majority properly cites *Matter of Giancarlo P.* (306 AD2d 28, 28 [1st Dept 2003]) for the proposition that "prolonged, unexcused absence from school does not, ipso facto, establish either the parental misconduct or the harm or potential harm to the child" (*id.*). However, in *Giancarlo*, we also made a specific finding that respondent parent "was actively engaged with school authorities in the process of securing an appropriate and specific special education placement for the child, and there is no evidence that the child's education was adversely affected by his absence from school" (*id.* at 28-29), two critical factors which are clearly missing here.

Nor does *Matter of Shanae F.* (61 AD3d 403 [1st Dept 2009]) support the majority's position. In *Shanae*, the unrefuted evidence demonstrated that respondent parent actively "sought to address the reason for the child's absences from school, which was the child's concern about a member of the school's administration, by having the child transferred to a different school," which attempts "were frustrated by the school's failure to assist her in that regard" (*id.* at 404). There is no evidence here that school and social services personnel did anything but attempt to bring Brianna's absenteeism to respondent's attention and try to offer solutions to this problem.

Likewise, *Matter of Alexander D.* (45 AD3d 264 [1st Dept 2007]) is factually distinguishable from this case. *Alexander* involved a 10-year-old autistic child with unexcused absences from school. However, unlike here, "respondent mother was actively engaged in 'securing an appropriate and specific special

education placement for the child, and there is no evidence that the child's education was adversely affected by his absence from school' " (*id.*, quoting *Matter of Giancarlo P.*, 306 AD2d 28, 28-29 [2003]).

In this case, respondent made occasional, feeble attempts to ensure that Brianna attended school. These attempts, when viewed objectively in context with Brianna's other behavioral problems, fell far short of the minimum degree of care required by statute (Family Ct Act § 1012 [f] [i]). It is uncontroverted that Brianna's education was adversely affected by her absence from school, as she was failing all subjects. Although respondent denied that she was repeatedly advised of Brianna's absences and tardiness, and that she only received two letters and no phone calls from school officials, the record clearly demonstrates otherwise. There was testimony from Brianna's school attendance officer that she sent at least 20 letters and made 50 phone calls to respondent in an effort to enlist her to get Brianna to school. Both the attendance officer and the ACS caseworker testified that they told respondent she should accompany Brianna to school. During the approximate three week time period that respondent did this, Brianna attended school. Respondent's self-serving testimony that she did not have a MetroCard and therefore could not continue to take Brianna to school is unsupported by any financial or other proof. In fact, the court found respondent's explanation of, and her attempts to downplay the extent of, Brianna's absences "completely unbelievable and lacking in any credibility." The record is replete with numerous other examples where the court found respondent to be less than candid, and it more than adequately supports that finding.

Of particular note is the fact that, in cases involving fewer absences and tardiness, coupled with inadequate parental explanations for such behavior, we found that a preponderance of the evidence supported a finding of educational neglect (*see e.g. Matter of Kaila A. [Reginald A.—Lovely A.]*, 95 AD3d 421, 421 [1st Dept 2012] [59 missed days of school in a two-year period]; *Matter of Aliyah B. [Denise J.]*, 87 AD3d 943, 943-944 [1st Dept 2011] [64 out of 181 missed days and 38 late days in one school year]; *Matter of Annalize P. [Angie D.]*, 78 AD3d 413, 414 [1st Dept 2010] [five excused, 24 unexcused absences in one school year]). In each of these cases, we specifically found no reason to disturb the Family Court's credibility determinations.

The majority's rejection of the Family Court's evaluation of the evidence and credibility of the witnesses finds no support in the record. "In a matter which turns almost entirely on assess-

ments of the credibility of the witnesses and particularly on the assessment of the character and temperament of the parent, the findings of the nisi prius court must be accorded the greatest respect" (*Matter of Irene O.*, 38 NY2d 776, 777 [1975]). While we certainly are not bound to slavishly follow the Family Court's factual determinations and resolutions of the credibility of witnesses, such findings "are to be accorded great deference from this Court and should not be disturbed unless clearly unsupported by the record" (*Matter of Emily PP.*, 274 AD2d 681, 683 [3d Dept 2000]; *Matter of Irene O.*, 38 NY2d at 777; *Matter of Danny R.*, 60 AD3d 450 [1st Dept 2009]).

In this regard, the majority's rejection of Family Court's findings with respect to a 15th birthday party hosted by respondent is puzzling. Respondent admitted that she was the only adult present; that the party was scheduled to start at midnight and end at 2:00 a.m.; and that approximately 30 people were present, all of whom were under the age of 21. The police officer who testified at the hearing stated that at approximately 3:20 a.m. on the date of the party, he responded to respondent's apartment building on a call of "shots fired." Upon arrival, he found a male who had reportedly been attending a party and had been shot in the eye outside the building. The officer went to respondent's apartment where he was advised the party was taking place and found approximately 50 children, most of whom appeared intoxicated. He interviewed most of those present and found them to be between the ages of 14-18 years old. Most of the children interviewed by the officer had strong smells of alcohol on their breath, exhibited slurred speech and admitted that they had been drinking alcohol. He recalled finding a large trash container filled with empty beer containers in the apartment. While he recalled seeing Brianna in the apartment, he did not speak to her and she did not appear to be intoxicated.

Although the majority correctly notes that "there was no evidence that the child [Brianna] had consumed alcohol that night," it concludes that "any finding of neglect based upon that incident is speculative." This misreads Family Court's decision. The court found only that this incident established that "[r]espondent failed to provide Brianna with adequate supervision or guardianship under FCA § 1012." The finding of neglect by Family Court was based upon the entire record, not simply the drinking incident. These findings are far from "speculative." Notably, given Brianna's acknowledged mental and emotional issues, it is beyond cavil that this incident placed her "in imminent danger of becoming impaired as a result of the failure of [her] parent . . . to exercise a minimum degree of care." (Family Ct Act § 1012 [f] [i].)

There is no question that Brianna has a number of mental and behavioral issues which require serious attention.* Family Court's dispositional order recognized both Brianna's issues and respondent's need of assistance in dealing with them by paroling Brianna back to respondent under agency supervision. Such disposition is consistent with Family Court Act § 1012 (f) (i)'s requirement that a court "focus on serious harm or potential harm to the child, not just on what might be deemed undesirable parental behavior" (*Nicholson v Scoppetta*, 3 NY3d 357, 369 [2004]). That is precisely what Family Court did here. The fact-finding decision and dispositional order should therefore be affirmed.

---

* With respect to Brianna's behavioral issues, it is interesting to note that the presentment agency brought a Family Court Act article 10 petition for neglect rather than an article 7 petition against Brianna as a person in need of supervision.